IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBORAH R. COLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 11-1494 (RMC) |
| ) | |
| THE BOEING COMPANY, ) | |
| ) | |
| Defendant ) | |

## MEMORANDUM OPINION

Deborah R. Cole complains that The Boeing Company ("Boeing") discriminated against her on the basis of sex, retaliated when she complained, and imposed a hostile work environment. Boeing moves to dismiss, arguing that the District of Columbia Human Rights Act does not cover acts that occurred in the Commonwealth of Virginia and that Ms. Cole has failed to state a claim with respect to those acts that occurred in the District. The Court will grant in part and deny in part Boeing's motion.

## I. FACTS

Ms. Cole has filed a 418-paragraph Complaint specifying her claims in detail. According to Ms. Cole, the discrimination occurred in "three major phases." Compl. ¶ 1. The first phase is said to have occurred while Ms. Cole was working as a contractor at the National Geospatial-Intelligence Agency ("NGA") facility in Washington, D.C. Ms. Cole complains that she was retaliated against for making complaints to NGA's Office of Inspector General ("OIG") and for attempting to file an EEO charge. Ms. Cole also complains that she was subjected to a

hostile work environment. The second phase occurred after Ms. Cole was transferred to the NGA facility in Crystal City, Virginia on October 4, 2010. During this phase, Ms. Cole alleges that she was subject to discrimination based on her sex and retaliation. The third phase occurred after Ms. Cole was transferred from the NGA facility to Boeing's facility in Springfield, Virginia on March 2, 2011. During this phase, Ms. Cole complains of discrimination, retaliation, and a hostile work environment. The Court will summarize the allegations that pertain to her work in the District of Columbia.

Ms. Cole was employed, in turn, by L1, Inc. and Boeing on contracts with the NGA at the Washington, D.C., Navy Yard. "NGA is a combat support agency within the U.S. Department of Defense. NGA provides imagery, geospatial and targeting analysis for defense purposes, relief operations and navigation." Compl. ¶ 2 n.1. While at L1, Ms. Cole worked on a contract for the NGA's Science & Methodologies ("PLSS") Group. She left that employment[1] and was hired by Boeing on February 12, 2010 to work on a different NGA contract at the same location. Ms. Cole actually began to work for Boeing on February 23, 2010.

When Ms. Cole reported to work on the Boeing contract with NGA, the federal agency provided no work to her because she was a photogrammetrist and not a geospatial analyst. Throughout February and March, 2010, various NGA branch chiefs declined to add Ms. Cole to their groups because she was not a geospatial analyst. Sometime in March 2010, NGA employee Shawna McGee[2] invited Ms. Cole to work on her team; Ms. McGee's branch chief, Dean

---

[1] This departure may have been involuntary. Ms. Cole has sued L1, Inc. alleging that she "was terminated by L1 soon after raising a claim under Title VII." Compl. ¶ 61 n.24.

[2] The Court notes that Ms. McGee's name is spelled variously as "McGee" and "McGhee." It adopts the former spelling with apologies if that is incorrect.

Compton, agreed to this proposal "about the middle of March 2010." Compl. ¶ 57. Ms. Cole was supervised by three Boeing employees: Rodd Chin, site lead; Dean Hand, Program Manager; and Don Vance, Division Manager. Although he was based in St. Louis, MO, Mr. Hand was Ms. Cole's immediate Boeing supervisor.

On April 1, 2010, Mr. Compton brought Ms. Cole into his office, shut the door, and yelled at her, accusing her of destroying a PLSS database. Ms. Cole "told him that she had no idea what he was talking about . . . . He said that he ha[d] worked a long time to develop a good working relationship with PLSS and now [Ms. Cole] had ruined it." *Id.* ¶ 62.

The next day, April 2, 2010, Mr. Compton again brought Ms. Cole into his office and told her that "he did not want her on the contract and was pulling her out of McGee's group." *Id.* ¶ 63. "Mr. Compton also told her that he never had any use for [her] in the first place because she was a photogrammetrist, and he only needed a geospatial analyst." *Id.* As a result, Ms. Cole only worked on Ms. McGee's team for approximately two weeks. *Id.* ¶ 65.

Ms. Cole reported these events to Mr. Hand on April 5, 2010, including Mr. Compton's "false accusations of her destroying a database and his continued harassment of her on this issue." *Id.* ¶ 66. Mr. Hand attempted to placate Ms. Cole by telling her that her job was safe, that her position was written into the contract with Boeing, and that "the geospatial analyst position was going to roll over into a photogrammetrist position." *Id.* ¶ 67. He also stated that he would take care of the issue and speak to Geoffrey Young, the NGA Branch Chief responsible for defense contractors on the Boeing-NGA contract about it.

When an investigator for the OIG came to the Navy Yard facility on April 12, 2010, Ms. Cole informed him that "the PLSS group and Mr. Compton were defaming her

reputation by spreading lies about her and . . . she wanted it to stop." *Id.* ¶ 71.  She also alleged harassment due to her gender and said that she wanted to file a charge with the agency's Office for Equal Employment Opportunity ("EEO").  *Id.*

Ms. Cole was put on a different team, working on cartographic maps.  Although Mr. Compton often visited the area in which she worked and talked to her co-workers, he never spoke with her or answered any of her work-related emails.  A fellow employee reported to Ms. Cole that "PLSS had told Mr. Compton that [Ms. Cole] had destroyed their database."  *Id.* ¶ 82.

On July 5, 2010, an NGA employee reported to Ms. Cole that she had overheard Mr. Compton on the telephone complaining that Ms. Cole was giving him trouble with the Inspector General and that he wanted to know when Ms. Cole would be off the Boeing-NGA contract.  This report was followed by an instant message from another NGA employee on July 9, 2010, saying that she had heard Mr. Compton "tell someone on the phone about how [Ms. Cole] destroyed the PLSS database."  *Id.* ¶ 86.

When Ms. Cole looked at the NGA website, she learned that employees of private sector contractors to NGA were to file EEO charges through their employers and not with NGA's EEO office.  Although she forwarded a link to this information to Rodd Chin, the site lead employee, she did not receive a response.  She talked to Mr. Hand, her Boeing supervisor, on July 9, 2010, and told him that "she thought Mr. Compton's slanderous allegations about her to the contract officer [were] reprisal for her filing a complaint against him with the OIG."  *Id.* ¶ 93.  On July 12, 2010, Ms. Cole learned from Mr. Hand that:

> Mr. Compton was contacting people in charge of the contract and saying that [Ms. Cole] had went [sic] to the second floor (the PLSS group) after she started work with Boeing and purposefully logged in with a

> username and password so as to get into a confidential database, in order to destroy it. Mr. Compton apparently told others that [Ms. Cole] did this a number of times.

*Id.* ¶ 95. Two days later, Mr. Hand sent her an email advising, "DO NOT SUE while you are on this contract. I am fairly certain that Big Boeing and others above me would not look favorably upon that. Especially with EPASS hanging in the balance. That's not one contract. That's THE contract." *Id.* ¶ 100. Mr. Chin repeated this advice to Ms. Cole the next morning.

Mr. Hand sent an email to Boeing employees on the NGA contract on August 27, 2010, telling them that they were no longer to contact the OIG without first telling Mr. Hand, as it damaged Boeing's reputation. As a result, Ms. Cole withdrew a complaint against Mr. Compton that she had previously filed on an online DSS Hotline. She heard from Rodd Chin on July 15, 2010 that the OIG investigation into the destruction of the PLSS database was complete and the log-ins were not from Ms. Cole. Mr. Hand sent her an email on July 16 documenting his conversations with Mr. Compton about Mr. Compton's accusations against Ms. Cole and Mr. Compton's intention to have her replaced. Ms. Cole spoke again with Mr. Chin on July 20, 2010. She asked about filing an EEO complaint, and he said he would get back to her.

Mr. Hand advised Ms. Cole by email, on July 21, 2010, that Boeing needed to swap her out with another person on the contract. Mr. Chin later emailed her and advised her that she would probably be swapped out with someone on his team. When she responded to Mr. Chin that she was ready to file an EEO complaint, he again indicated that he would get back to her. Then Mr. Compton himself delivered a copy of the OIG report on its investigation to Ms. Cole, which she thought was both strange and threatening as he was the subject of the OIG complaint she had made. Later, on August 9, 2010, Mr. Hand stopped by her work area and told

Ms. Cole that swapping her out to a new team was the best option. He added, "If you decided to sue the federal government, you'd have one hell of a lawsuit. But whatever you do, DON'T sue." Compl. ¶ 112 (emphasis in original).

One week later, on August 26, 2010, Ms. Cole received an average performance evaluation from Boeing. Ms. Cole "felt she received an average performance evaluation because of her complaint to the OIG against [Mr.] Compton and her intent to file a claim with the EEO [office] and the [Equal Employment Opportunity Commission]." *Id.* ¶ 113. Mr. Hand notified Ms. Cole on August 27, 2010 that she would be transferred to the NGA facility in Crystal City, Virginia effective October 4, 2010. Before she left, Stephen Fraise, an NGA employee, advised her that Mr. Compton "had had it out for her since the beginning." *Id.* ¶ 120. When Ms. Cole asked Mr. Fraise why males who were former military were treated differently than females, "Mr. Fraise grabbed his crotch and said that [Ms. Cole] was 'not part of the boys club' and that is just the way it is." *Id.* ¶ 121.

Ms. Cole began to work on the Boeing contract with NGA in Crystal City, Virginia on October 4, 2010. She complains here that her performance rating in August was in retaliation for her complaint to the OIG, *id.* ¶ 16, and that her transfer to Virginia in October was in retaliation for both her OIG complaint and requests for permission to file an EEO complaint. *Id.* She also complains that she was subjected to a hostile work environment at the NGA facility in D.C.

## II.  LEGAL STANDARD

### A.  Lack of Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  When reviewing a motion to dismiss for lack of jurisdiction, a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F. 3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions."  *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is an Article III and a statutory requirement.  *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see also Kokkonen v. Guardian life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (internal citations omitted).

### B.  Failure to State a Claim

A motion to dismiss for failure to state a claim challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).  A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570.

A court must treat the complaint's factual allegations as true "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### III. ANALYSIS

#### A. The Scope of the District of Columbia Human Rights Act

Boeing moves to dismiss all allegations in Ms. Cole's Complaint that occurred after she was transferred from the NGA facility in D.C. to Virginia. Boeing argues that the Court lacks subject matter jurisdiction under the District of Columbia Human Rights Act ("DCHRA") for conduct that did not occur within the District of Columbia. Ms. Cole argues that subject matter jurisdiction is appropriate, given that many incidents occurred in the District of Columbia, and requests that the Court adjudicate her entire claim. Because the acts alleged in Virginia are separate and distinct from those alleged in the District of Columbia, and because those acts were

neither made from nor felt within the District, the Court will dismiss all claims that occurred after Ms. Cole's transfer to Virginia.

The intent of the DCHRA is "to secure an end *in the District of Columbia* to discrimination for any reason other than that of individual merit . . . ." D.C. Code § 2-1401.01 (emphasis added). "[T]he most important factor in determining whether a court has subject matter jurisdiction over a [DCHRA] claim is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District." *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 104 (D.D.C. 2009) (quoting *Quarles v. Gen. Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 20 (D.D.C. 2009)). If an employee is not employed in the District, "[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia" for there to be jurisdiction under the DCHRA. *Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301 (D.C. 2009). The DCHRA is not extraterritorial; it does not and cannot secure an end to discrimination in jurisdictions outside of the District of Columbia. *See id; cf. Mann v. Dist. of Columbia,* 22 App. D.C. 138 (D.C. 1903) ("it is very plain that the commissioners of the District of Columbia are without authority of law to control [an individual] in the disposition which he makes of his property outside of this District. . . . The regulation cannot be allowed any extraterritorial force . . . .")

In the present case, Ms. Cole alleges three distinct "phases" of discrimination. "The first phase . . . involves [Ms. Cole's] employment with Boeing while working as a contractor at the Washington D.C. Navy Yard . . . . The action here is for hostile work environment and retaliation." Compl. ¶ 2. The second "phase" of discrimination took place at the NGA facility in Crystal City, Virginia and "is for discrimination and retaliation." *Id.* ¶ 4.

The third phase occurred at Boeing's facility in Springfield, Virginia and "is for discriminatory treatment, hostile work environment and retaliation." *Id.* ¶ 5.

There is little, if any, factual overlap between the hostile work environment and retaliation Ms. Cole complains she suffered while in the District, and her later claims of discrimination in Virginia. In D.C., Ms. Cole's immediate supervisor was Mr. Compton (an NGA employee) and Ms. Cole complains that he harassed her for allegedly destroying the PLSS database. Once Ms. Cole was transferred to Virginia, her immediate supervisor was Mr. Cuddson (a Boeing employee). There is no indication that Mr. Compton continued to have any oversight over Ms. Cole after her transfer or that he continued to harass her. Instead, after her transfer, Ms. Cole complains that Mr. Cuddson: (1) unfairly gave her a negative performance evaluation; (2) "demoted" her from her position as "Team Lead," Compl. ¶ 168; (3) suspended her for three days without pay; and (4) engaged in "a systematic pattern of humiliation and embarrassment by retaliating against her again for an additional period of forty six (46) continuous days [until her termination]." Compl. ¶ 236, 25. Each of these events occurred in a different state with a different supervisor.

Like the District of Columbia, Virginia has a human rights act to prevent discrimination within its territorial boundaries. *See* Va. Code Ann. § 2.2-3900 ("It is the policy of the Commonwealth to . . . [s]afeguard all individuals within the Commonwealth from unlawful discrimination . . . ."). When Ms. Cole filed her EEOC charge involving the discriminatory acts that occurred in Virginia, she cross-filed the charge with the Arlington Human Rights Division in Virginia. The mere fact that Ms. Cole once worked in the District of Columbia and was subsequently transferred to Virginia does not create subject matter jurisdiction

under the District of Columbia Human Rights Act for conduct that occurred in Virginia. After the transfer, Ms. Cole worked in Virginia, her supervisor was located in Virginia, and the alleged acts of discrimination, hostile work environment, and retaliation all occurred in Virginia. Because these acts did not take place "in the District of Columbia," D.C. Code § 2-1401.01, and because neither the decision to act, nor the effects of the acts were felt in the District of Columbia, *Monteilh*, 982 A.2d at 305, the Court lacks jurisdiction under the DCHRA to adjudicate Ms. Cole's claims based upon conduct that occured after she left the District.

### B. Count I - Sex Discrimination

The Court will dismiss Count I, alleging discrimination on the basis of sex, in its entirety. As just discussed, Ms. Cole cannot seek relief under the DCHRA for conduct that occurred in Virginia. Furthermore, she has not alleged that she suffered any sex discrimination while employed at the NGA facility in D.C. Ms. Cole complains that she was repeatedly harassed by her supervisor, Mr. Compton, but she alleges that the harassment came from his mistaken belief that she destroyed the PLSS database, not because of her gender. *See* Compl. ¶¶ 61-63, 66. Although Ms. Cole does recount a conversation she had with a colleague where she stated that "military males are exempt from hostile behavior from management, unlike female collage grads with no prior military experience," *Id*. ¶ 120, she fails to connect any adverse action to her gender. *See Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex.") (internal quotation marks omitted).

Boeing points this out in its motion to dismiss stating that "Plaintiff has only alleged gender discrimination against Boeing during her employment in Virginia." Mot. to

Dismiss at 8.  Boeing argues that Count I should be dismissed in its entirety because Ms. Cole fails to allege *any* acts of sex discrimination that occurred in the District.  Ms. Cole failed to respond to or rebut this argument in her opposition.  Thus, even if Ms. Cole's 418-paragraph Complaint could be read as advancing a claim for gender discrimination while she worked at the NGA facility in D.C., she waived any such claim by failing to respond to the argument raised in Boeing's motion to dismiss. *See, e.g., CSX Transp., Inc. v. Commercial Union Ins., Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996); *Jones v. Air Line Pilots Ass'n,* 713 F. Supp. 2d  29, 38-39 (D.D.C. 2010)*; Hopkins v. Women's Div., Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

### C.  Count II - Retaliation

Boeing argues that Ms. Cole's claim for retaliation while she worked at the NGA facility in D.C. should be dismissed because "the Complaint does not establish an adverse employment action in the District of Columbia."  Mot. to Dismiss at 10.  Specifically, Boeing alleges that the adverse performance evaluation, repeated instruction to not sue, and eventual transfer were not adverse actions because they did not cause "a material change in her employment status, her benefits, her duties, or her salary." *Id.*  An action need not result in a material change in employment status, however, to qualify as "adverse" in the context of retaliation.

"[T]he proscription against retaliation sweeps more broadly than the proscription against discrimination." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (citing

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–67 (2006)). If a plaintiff claims the action was retaliatory, she need only show that the action "could well dissuade a reasonable employee from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.[3] Unlike discriminatory actions, retaliatory actions need not be employment related or occur in the workplace to be prohibited by Title VII, *Burlington Northern*, 548 U.S. at 67, nor must they result in "a materially adverse change in the terms or conditions of [one's] employment." *Id.* at 70. Whether an action "is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* at 71 (quoting *Oncale*, 523 U.S. at 81).

Ms. Cole's allegations are sufficiently adverse to meet the *Burlington Northern* standard. Although the performance evaluation alone is not an adverse action, *see, e.g., Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009), the repeated instruction to not file a lawsuit and her

---

[3] Neither the D.C. Circuit nor the D.C. Court of Appeals has stated whether the *Burlington Northern* standard for retaliation applies to the DCHRA. In this circuit, plaintiffs generally allege retaliation under both Title VII and the DCHRA, and the courts apply the *Burlington Northern* standard without questioning its applicability to the DCHRA. *See Guajacq*, 601 F.3d at 576-77; *Ali v. Dist. of Columbia Government*, 697 F. Supp. 2d 88 (D.D.C. 2010); *Kelly v. Mills*, 677 F .Supp. 2d 206 (D.D.C. 2010); *Ibrahim v. Unisys Corp.*, 582 F. Supp. 2d 41(D.D.C. 2009); *Mentzer v. Lanier*, 677 F. Supp. 2d 242 (D.D.C. 2010); s*ee also Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23 (D.D.C. 2009) (applying *Burlington Northern* to plaintiff's retaliation claim under the ADEA and DCHRA). Given that (1) the DCHRA was "modeled on Title VII," *Howard University v. Green*, 652 A.2d 41, 45 n.3 (D.C. 1994); (2) the D.C. Court of Appeals "look(s) for guidance to our cases addressing retaliation under the DCHRA and to retaliation case law under [Title VII]" *id.* at 45; (3) the Supreme Court's decision in *McDonnell Douglass*, 411 U.S. 792 (1973) while "only" a Title VII case, nonetheless, applies equally to the DCHRA, *see, e.g., Gaujacq*, 610 F.3d at 577; and (4) neither party has argued that *Burlington Northern* is inapplicable, the Court will analyze Ms. Cole's DCHRA claim of retaliation under the standard set forth in *Burlington Northern.*

eventual transfer may be sufficiently adverse to "dissuade a reasonable employee from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.  According to the Complaint, Boeing's supervisors repeatedly directed Ms. Cole to not sue.  The first instance occurred two days after Ms. Cole learned from Mr. Hand that Mr. Compton was telling people that she had destroyed the PLSS database.  Mr. Hand emailed Ms. Cole and said, "DO NOT SUE while you are on this contract.  I am fairly certain that Big Boeing and others above me would not look favorably upon that.  Especially with EPASS hanging in the balance.  That's not one contract.  That's THE contract." Compl. ¶ 100 (emphasis in orginal).  The next day, Mr. Chin pulled Ms. Cole aside and repeated this advice, stating that Mr. Hand had called him "to convince [Ms. Cole] not to sue." *Id.* ¶ 101.  Finally, when Mr. Hand informed Ms. Cole that transferring her to another NGA facility would be the best option, he allegedly stated "[i]f you decided to sue the federal government, you'd have one hell of a lawsuit.  But whatever you do DON'T sue." *Id.* ¶ 112 (emphasis in original).  These repeated, explicit directives from a supervisor "could well dissuade a reasonable employee from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.

### D. Count III - Hostile Work Environment

"To make out a claim under the DCHRA for creating a hostile work environment, a plaintiff must prove '(1) that [she] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.'" *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245 (D.C. 2009) (quoting *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003)

(en banc)).  "A work environment is actionably hostile 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . .'" *Id.*

The Court has already found that Ms. Cole failed to allege and/or waived any argument that she was harassed on the basis of her gender.  As such, she has no claim that the alleged hostile work environment was based upon her membership in any class protected by the DCHRA.  *See id.; see also Kelley v. Billington*, 370 F. Supp. 2d 151, 157 (D.D.C. 2005) (hostile work environment must be the result of discrimination based on plaintiff's protected status); *Burton v. Batista*, 339 F. Supp. 2d 97, 107 (D.D.C. 2004) (same); *Lester v. Natsios*, 290 F. Supp. 2d 11, 31-32 (D.D.C. 2003) (same).  Accordingly, the Court will dismiss Count III of her Complaint.

### E.  Counts IV & V - Emotional Distress

In Counts IV and V of her Complaint, Ms. Cole seeks damages for intentional and negligent infliction of emotional distress.  As Boeing correctly points out, these counts are preempted by the District of Columbia's Workers' Compensation Act ("WCA"), D.C. Code § 32-1501, *et seq.  See* D.C. Code § 32-1504(a) ("The liability of an employer prescribed in § 32-1503 shall be exclusive . . . ."); *Vanzant v. WMATA*, 557 F. Supp. 2d 113, 117 (D.D.C. 2008) ("[T]he WCA is the exclusive remedy for a workplace injury"); *Carson v. Sim*, 778 F. Supp. 2d 85, 96 (D.D.C. 2011) ("A claim for the tort of intentional infliction of emotional distress falls within the [WCA's] coverage."); *Ramey v. Potomac Elec. Power Co.*, 468 F. Sup. 2d 51, 55-56 (D.D.C. 2006).  Ms. Cole concedes as much in her Opposition.  *See* Opp'n at 5.  Accordingly, the Court will dismiss Counts IV and V of the Complaint.

## IV.  CONCLUSION

Ms. Cole's claims concerning events in the Commonwealth of Virginia will be dismissed because the DCHRA does not cover the complained of acts in Virginia, and therefore this Court is without jurisdiction over them.  With respect to events that took place in the District of Columbia: (1) Ms. Cole's claim for discrimination will be dismissed because she has not tied the discrimination to her gender and has waived any opportunity to do so; (2) Ms. Cole's claim for retaliation will not be dismissed because she has sufficiently alleged one or more adverse actions; (3) Ms. Cole's claim for a hostile work environment will be dismissed because she failed to tie the harassment to a protected class; and (4) Ms. Cole's claims for intentional and negligent infliction of emotional distress will be dismissed because they are preempted by the WCA.  A memorializing Order accompanies this Memorandum Opinion.


Date: March 1, 2012                                     /s/
                                            ROSEMARY M. COLLYER
                                            United States District Judge