**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEBORAH R. COLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Civil Action No. 11-1494 (RMC)** |
| | ) |
| THE BOEING COMPANY, | ) |
| | ) |
| Defendant. | ) |

## OPINION

Deborah Cole sues The Boeing Company for alleged retaliation in violation of the

District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01 *et seq.*, and Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Boeing denies that it retaliated against

Ms. Cole in any way and contests Ms. Cole's allegations on all bases. The Court finds that Ms.

Cole complained of actions by a civilian employee of the National Geospatial Intelligence

Agency that were entirely unrelated to discrimination made unlawful by Title VII or the

DCHRA. For these reasons, summary judgment will be granted to Boeing.

## I.    FACTS

### A.  Ms. Cole's Work at the Washington Navy Yard

Deborah Cole, a Caucasian woman, worked as a contractor at the Washington,

D.C., Navy Yard for BAE Systems PLC, or its predecessors, until early 2010. 2nd Am. Compl.

[Dkt. 38] ¶ 34 n.9. Ms. Cole worked in the National Geospatial Intelligence Agency's (NGA)[1]

---

[1] "NGA is a combat support agency within the U.S. Department of Defense. NGA provides
imagery, geospatial and targeting analysis for defense purposes, relief operations and
navigation." 2nd Am. Compl. ¶2 n.1.

Science & Methodologies (PLLS) division as a contractor on a contract between L1, Inc. and the NGA.[2]  Ms. Cole became an employee of The Boeing Company on February 12, 2010, and began working as a photogrammetrist on a Boeing/NGA contract at the Washington Navy Yard on February 23, 2010.[3]  Ms. Cole was assigned to work at NGA's Persistent Surveillance & Improvised Explosives Devices (PSID) Division.  She received direction from Boeing employees Rodd Chin, who was her site lead; Dean Hand, who was her Program Manager and immediate supervisor; and Don Vance, who was her Division Manager.  Mr. Chin provided day-to-day support, as Mr. Hand was physically located in St. Louis, MO.   The NGA Branch Chief with oversight of the PSID group was Dean Compton.

Because Boeing disputes that Ms. Cole complained of discrimination barred by Title VII or the DCHRA, the Court quotes liberally from the record; none of the relevant facts is disputed, only their legal significance.  According to Ms. Cole, she had difficulty being accepted by NGA managers in PSID because she is a photogrammetrist and not a geospatial analyst.[4]  *Id.*

_____

[2] In *Cole v. Hagel*, Case No. 13-cv-1990(KBJ) (D.D.C.), Compl. (filed Dec. 16, 2014) ¶ 2 n.4, Ms. Cole alleges that she worked at NGA for McClendon, LLC, a subsidiary of L-1 Identity Solutions, which was sold to BAE Systems PLC.  In that case, Ms. Cole alleges that she was terminated from McClendon/L1/BAE on Friday, January 22, 2010, in retaliation for reporting "discriminatory treatment at the hands of her NGA supervisor."  *Id.* at 2.

[3] Photogrammetry is "the science of making reliable measurements by the use of photographs and especially aerial photographs (as in surveying)."  The Free Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/photogrammetry (last visited Oct. 24, 2014; *see* also Oxford English Dictionary, Oxford Univ. Press (2014) (defining photogrammetry as "[t]he technique of using photographs to ascertain measurements of what is photographed, esp. in surveying and mapping").

[4] Normal dictionaries do not define "geospatial analyst."  Wikipedia provides a definition: A geospatial analyst applies "statistical analysis and other informational techniques to data which has a geographical or geospatial aspect . . . typically employ[ing] software capable of geospatial representation and processing, and apply[ing] analytical methods to terrestrial or geographic datasets, including the use of geographic information systems and geomatics."  Wikipedia, http://en.wikipedia.org/wiki/Geospatial_analysis (last visited Oct. 28, 2014).  Other courts in this

¶ 26 (PSID branch chiefs "did not want her on their team[s], because she was not a geospatial analyst."). Ms. Cole insists that the titles are interchangeable. *Id.* ¶ 26. Despite the real or perceived distinction, in March Ms. Cole was asked by NGA employee Shawna McGee to work on her team. Both Mr. Compton and Mr. Hand agreed.

On April 1, 2010, Mr. Compton called Ms. Cole into his office and "then proceeded to yell at her, falsely accusing her of destroying the PLSS database," in the program where Ms. Cole had formerly worked. *Id.* ¶ 34. Mr. Compton said that "he ha[d] worked a long time to develop a good working relationship with PLSS and now [Ms. Cole] had ruined it." *Id.* ¶ 35. On April 2, 2010, Ms. Cole met again with Mr. Compton and he "told her that he did not want her on the contract and that he was pulling her out of Shawna McGhee's group." *Id.* ¶ 35. Mr. Compton stressed that he had no need for a photogrammetrist in his group, but needed a geospatial analyst. *Id.* ¶ 36. Ms. Cole was then transferred out of Ms. McGhee's team. Distressed at Mr. Compton's accusation concerning the PLSS database, Ms. Cole immediately reported it to Mr. Hand.

Soon thereafter, employees working for NGA at the Washington Navy Yard were notified that representatives from the NGA Office of Inspector General (OIG) would be visiting on site and employees could make appointments to speak with them. Ms. Cole made an appointment and met with two OIG representatives on April 12, 2010. Ms. Cole reported to the OIG that Dean Compton was "slandering me from a previous group where I was working . . . [t]he PLSS on the second floor" that worked with L1. Mem. in Supp. of Mot. for Summ. J. [Dkt. 47-1] (MSJ), Ex. A (Cole Dep.) at 174.

---

District have cited Wikipedia. *See Kaufman v. Holder*, 686 F. Supp. 2d 40, 41 n. 1 (D.D.C. 2010).

Robert Ballard, NGA's Contracting Officer Representative (COR), complained about Ms. Cole in a June 29, 2010 email to Mr. Hand, titled "Personnel Issue":

> It has been brought to my attention that Deborah Cole is creating tension in her current position. She has informally interacted with image scientists in PL on a database issue and caused her removal from the HME team. She was told to not interact with the people in PL due to this issue. Apparently, she continued discussions with the PL analysts which resulted in NGA OIG requesting information from Dean Compton concerning Ms. Cole and PL and "messing up" a database and they wanted a full accounting of Ms. Cole's activities in PSID.
>
> The bottom line is that the working relationship with PSID and PL are strained with Ms. Cole's continued presence.

MSJ, Ex. D (Ballard 7/29/10 Email) at 3-4. Mr. Ballard sent a second email to Mr. Hand on July 13, 2010, forwarding a message from Mr. Compton concerning Ms. Cole's work in PSID. In that message, Mr. Compton noted that Ms. Cole was hired as a carto/photogrammetrist but that the contract now needed a geospatial analyst; that Ms. Cole's first assignment in PSID had been changed "to make sure she did not interact with our PL[SS] counterparts" [who had accused her of "messing up" the database]; that Ms. Cole "was only able to do tasks with extensive support and was not able to perform independently . . . [with a] very limited ability to perform at the expected level for an experienced [Geospatial Analyst (GA)];" that Ms. Cole had "even contact[ed] the NGA training coordinator" for more training; and that "using her to fill a GA position will not meet the requirement as she has not performed at an acceptable level as a GA." MSJ, Ex. E (Emails Re: Compton Comments) at 5. Mr. Ballard added that "[t]he important aspect is that she wants additional GA training, which would indicate she is not confident in her abilities to perform GA work, and needs extensive support to work issues." *Id.*

Mr. Hand forwarded Mr. Ballard's July 13 email to Ms. Cole within the hour of its receipt. His message: "Debbie, Just to confirm, did you contact NGA training for GA

classes?  I need details!!!"  MSJ, Ex. F (Hand/Cole Email Chain) at 3-4.  In her response, Ms.

Cole stated that, "All I did was innocently call Gregg Clark last week who is with NGA training

to ask him to find out what specifics there were to qualify for a GA position from a

photogrammetry position because Rodd [Chin] said it would be a good idea to find out that info.

Rodd kept pushing me to ask Dean for training, but I didn't."  *Id.* at 3.  She also complained

about continuing "lies" about her that would "becom[e] more and more elaborate as time

progresses."  *Id.* at 2.

Ms. Cole asked Mr. Hand to "[p]lease let me know when I can sue Compton for

for [sic] civil damages.  What he has been saying about my previous job, even though my boss

said he'd give me a great recommendation, cannot be legal. . . . Where I work now is the

complete opposite of that place and I fell blessed I work with such wonderful people.  I don't

want to lose all of that because of pipsqueaks like Compton who abuse their authority . . . ."  *Id.*

at 3.

Early the next morning, Mr. Hand answered Ms. Cole's late-night email, stating

in full:

> Dean Compton isn't being honest and I think that everyone there
> knows it.  I'm working the issue.  In fact, I just got off the phone
> with your IG [Point of Contact].  He'll be calling me back this
> afternoon.
>
> Yes, while you're on this contract, you WILL have this sort of
> conflict the entire time as long as Dean Compton is your [NGA
> Point of Contact].
>
> DO NOT SUE while you are on this contract.  I am fairly certain
> that Big Boeing and others above me would not look favorably
> upon that.  Especially with EPASS hanging in the balance.  That's
> not one contract.  That's THE contract.
>
> *Id.* at 2.

Mr. Hand answered Mr. Ballard on July 16, 2010, assuring him that the NGA OIG had investigated the PLLS database issue and found no incident of wrongdoing by Ms. Cole.  Mr. Hand also told Mr. Ballard that he had spoken with the Boeing PSID supervisors and "was told that [Ms. Cole] was doing a great job . . . .  All indications are that she is a valuable member of their team."  Emails Re: Compton Comments at 3.  Mr. Compton had ordered NGA employees not to talk with Boeing, so Mr. Hand was unable to obtain their input.  *Id.*  However, Mr. Hand reported that Ms. Cole had "made no formal requests for GA training" and only called NGA training "to find out what the NGA standard qualifications are for a GA."  *Id.*  Mr. Hand continued:

> As the initial allegation was resolved by the IG back in March showing no fault on Deborah's part, and her performance since has been satisfactory or better, it appears that this may be a mere personality conflict.  Hence, I am inclined to support her continued placement in this position at this point in time.
>
> Notably, from what I'm told, the image scientists in PL[SS] are SAIC contractors.  I also understand that at some point Deborah called NGA IG and filed a report against Dean Compton for spreading unsubstantiated rumors about her in regards to the incident involving the PL[SS] database.  Perhaps these factors are also influencing Dean Compton's perspective on the matter.
>
> In sum, by all accounts Deborah is a qualified GA, and at least at this juncture, there does not appear to be a valid reason for her not to continue at the [Washington Navy Yard] as a Geospatial Analyst.
>
> Of course, as our primary objective is to ensure that the right people are providing the best support possible, I remain [sic] to discuss the matter further.

*Id.* at 4.  On July 16, 2010, Mr. Hand forwarded his email to Ms. Cole "for your eyes only" (FYEO), and she responded on July 18, "Looks great !"  *Id*. at 2.

The NGA Inspector General sent a letter dated July 16, 2010, addressed to Ms. Cole at her workplace, explaining that it had reviewed her "14 April 10 concern alleging mistreatment and a hostile working environment."[5] Cole Dep., Ex. 6 (OIG 7/16/10 Letter). The IG, Thomas J. Burton, informed her that his office had "focused on your assertion that the PLSS branch chief and senior scientist made disparaging comments about you to the PSID branch chief, specifically that you 'messed up' the SYERS database before leaving PLSS." *Id.* The PSID branch chief, Mr. Compton, had told the OIG, however, that no one from PLSS had spoken to him but that a member of his PSID staff had indicated that Ms. Cole was creating tension with PLSS. For this reason, Mr. Compton had reassigned Ms. Cole and she was no longer on the team working with PLSS. The OIG considered the matter closed.

Ms. Cole received an interim performance evaluation from Mr. Hand in August 2010. Her overall rating was "Met Expectations" across 17 categories. Cole Dep., Ex. 9 (Interim Evaluation). She received the lower rating of "Met Some Expectations" in three categories and Mr. Hand commented that her interpersonal skills needed improvement. *Id.* Mr. Hand also rated Ms. Cole as having exceeded expectations in two categories and praised Ms. Cole for being "technically savvy and adaptable" and for going "the extra mile to prove herself and erase doubts." *Id.*

Mr. Hand notified Ms. Cole on August 27, 2010 that she was being transferred from the Washington Navy Yard office to a position at the NGA Crystal City, Virginia office to work on a new NGA contract beginning in October. Mr. Hand had previously asked Mr. Chin by email, on which Ms. Cole was copied, about swapping Ms. Cole's position with another

_____

[5] This letter was apparently handed to Ms. Cole by Mr. Compton on July 23, 2010. 2nd Am. Compl. ¶ 81. Ms. Cole complains that delivery by her alleged harasser "shocked and frightened" her. *Id.* The use of Ms. Cole's work address to report on an IG investigation cannot be explained on this record unless Ms. Cole had not provided her home address to the OIG.

geospatial analyst within the NGA contract because Mr. Hand "[didn't] see the friction between Debbie [Cole] and Dean [Compton] fading anytime in the next decade." Def. Facts, Ex. G (Email Chain Re: Swap) at 2. Mr. Hand discussed the possibility of a transfer with Ms. Cole in early August 2010, asking if she would like him "to find a position, you know, similar to this one outside where you don't have to worry about Dean Compton? You know, give you a fresh start. You don't have to worry about him, you know badmouthing you." MSJ, Ex. B (Pl. Hand Dep.) at 116.[6] Ms. Cole did not suffer a reduction in pay when she transferred to the Crystal City position and she became a team lead. Cole Dep. at 251. Her commute remained approximately the same length. *Id*. at 209-10.

Based on these allegations, Ms. Cole alleges that Boeing violated her rights under the DCHRA and Title VII.

### B. Procedural History

Ms. Cole exhausted her administrative remedies by filing a timely charge with the Washington, D.C. field office of the Equal Employment Opportunity Commission (EEOC), which was cross-filed with the D.C. Office of Human Rights. 2nd Am. Compl. ¶ 17. She received a Right to Sue letter from the EEOC in April 2011 and filed suit in the Superior Court of the District of Columbia on July 18, 2011, complaining of gender discrimination and retaliation in both the District of Columbia and Virginia, relying solely on the DCHRA. Boeing removed the case to federal court pursuant to 28 U.S.C. § 1441. *See* Notice of Removal [Dkt. 1].

---

[6] Mr. Hand recalled that Ms. Cole was open to the idea "as long as it took her out of Dean Compton's . . . area of influence." *Id.* at 116. In her deposition testimony, Ms. Cole states that she viewed her transfer to the Virginia office as a form of retaliation "[b]ecause I had no say in anything. [Mr. Hand] just moved me. He didn't ask me what, what I thought." Cole Dep. at 248. This difference in recollection is not relevant as to whether Ms. Cole suffered a material adverse action and therefore does not present an issue of material fact. *See Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

On March 1, 2012, this Court dismissed all but one claim: Ms. Cole's claim for retaliation under the DCHRA based on facts occurring in the District of Columbia. *See Cole v. Boeing Co.*, 845 F. Supp. 2d 277 (D.D.C. 2012). Ms. Cole filed a motion for reconsideration, Dkt. 17, which the Court denied. *See* Order [Dkt. 20].

Ms. Cole then filed a Motion to Amend as of Right, or in the Alternative, Motion for Leave to File an Amended Complaint, seeking to add Title VII as a ground for her complaint. *See* Mot. to Amend [Dkt. 14]. On November 1, 2012, this Court granted leave for Ms. Cole to amend her complaint only to the extent that she sought to add Title VII as a ground for her claim that Boeing retaliated against her based on events that occurred in the District of Columbia. The motion was denied in all other respects. *See* Order [Dkt. 22]. Ms. Cole's First Amended Complaint was stricken as not in compliance with the Court's Orders as to the scope of the claims Ms. Cole could pursue. *See* Order [Dkt. 31]. Ms. Cole then filed a Second Amended Complaint on February 25, 2013. After discovery, Boeing filed a Motion for Summary Judgment [Dkt. 47], which is now fully briefed.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). On summary judgment, the burden on a moving party who does not bear the ultimate burden of proof in the case may be satisfied by making an initial showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

The burden then shifts to the nonmovant to demonstrate the existence of a genuine issue of material fact. The nonmovant may not rest on mere allegations or denials, but must instead by affidavit or otherwise, present specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (nonmovant must present specific facts that would enable a reasonable jury to find in its favor).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

District courts use "special caution" when considering summary judgment in employment discrimination or retaliation actions due to "the potential difficulty for a plaintiff . . . to uncover clear proof of discriminatory or retaliatory intent." *Nurriddin v. Bolden,* No. 04–2052, 2014 WL 1648517, at *5 (D.D.C. Apr. 25, 2014) (citation omitted). "Nevertheless, the plaintiff is not relieved of his obligation to support his allegations with competent evidence." *Id.*

### III.    ANALYSIS

Boeing contends that Ms. Cole did not engage in any activity protected under Title VII or the DCHRA, did not suffer any retaliation or materially adverse action, and fails to show that Boeing's proffered legitimate non-retaliatory reasons for the alleged material adverse actions are pretextual.

### A.  Title VII Allegations

Title VII prohibits an employer from retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice by this title, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e-3(a).  The *McDonnell Douglas* burden-shifting framework applies to claims of retaliation.  *Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  First, the plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered from a materially adverse act; and (3) a causal connection exists between the protected activity and the employer's act.[7]  *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).  "If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions.  If the employer does so, the burden-shifting framework disappears." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citations and quotations omitted).  Then, "a court reviewing summary judgment looks to

---

[7] "The casual connection component of the *prima facie* case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  To satisfy the knowledge requirement, a plaintiff must show that the official responsible for the alleged retaliatory act was aware of the protected activity.  *Id.*  Without direct proof, the temporal proximity between the protected activity and the adverse employment action must be "very close."  *Moran v. U.S. Capitol Police Bd.*, 887 F. Supp. 2d 23, 35 (D.D.C. 2012) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

whether a reasonable jury could infer retaliation from all the evidence, which includes not only the *prima facie* case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [plaintiff's] evidence of retaliation." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting *Jones*, 557 F.3d at 677). Unlike status-based discrimination claims, retaliation claims must be proved according to traditional principles of but-for causation and not the lessened causation test stated in § 2000e-2(m). *Univ. of Texas Sw. Med. Mtr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id*. at 2534.

With regard to whether an employer's action is "materially adverse," a court considers whether the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Pardo–Kronemann v. Donovan,* 601 F.3d 599, 607 (D.C. Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). Whether an action "is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Burlington*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 81 (1998)).

Count I of the Second Amended Complaint alleges retaliation under Title VII, alleging that Ms. Cole "engaged in protected activity and opposition to practices made unlawful under Title VII by opposing discriminatory and/or harassing practices at the workplace, and/or by participating in protected activity with the OIG, and/or the EEO or EEOC." 2nd Am. Compl. ¶ 91. Boeing contends that it is entitled to summary judgment because Ms. Cole has failed to make out a *prima facie* case for retaliation. The Court agrees.

12

None of Ms. Cole's actions constituted protected activity under Title VII, which dooms her retaliation claim under that statute. Title VII does not bar ill treatment because an employee complains to an inspector general, because a manager erroneously blames the employee for suspected misconduct, or because a manager engages in actions perceived as harassment after such an IG complaint or erroneous accusation of blame. Protected activity under Title VII is limited to participating in EEO activity or opposing unlawful employment practices as defined in 42 U.S.C. § 2000e–2 & e–3, which deal exclusively with employment discrimination on the basis of race, color, religion, sex, or national origin. *King v. Jackson,* 468 F. Supp. 2d 33, 37–38 (D.D.C. 2006). This Circuit has held that "an employee seeking the protection of the opposition clause [must] demonstrate a good faith, reasonable belief that the challenged practice violates Title VII." *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (quoting *Parker v. Balt. & Ohio R.R. Co.,* 652 F.2d 1012, 1020 (D.C. Cir. 1981)). Complaining about mistreatment, "without mentioning discrimination or otherwise indicating that gender was an issue, does not constitute protected activity, even if the employee honestly believes she is the subject of sex discrimination." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (citing *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 727-28 (7th Cir. 2003)). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination." *Id*.

Ms. Cole first argues that she engaged in protected activity when she informed Mr. Hand in April 2010 that Mr. Compton had accused her of destroying the PLSS database, threatened to terminate her, and harassed her. 2nd Am. Compl. ¶ 39. Less than two weeks later, Ms. Cole complained to the Office of the Inspector General that "the PLSS group and Mr. Compton were defaming her reputation by spreading lies about her and that she wanted it to stop." *Id*. ¶ 42. "She also informed the investigator that she felt she was being harassed and that

she would also like to file a charge with NGA's Equal Employment Opportunity (EEO) office." *Id.*[8]

Further describing her alleged protected activities, Ms. Cole alleges that she told Mr. Hand she went to the OIG "because she wanted the harassing treatment and false allegations to stop," *id.* ¶ 62, and because "Mr. Compton's slanderous allegations about her to the contract officer [were] reprisal for her filing a complaint against him with the OIG." *Id.* ¶ 64. In response to Mr. Hand's email advice, "DO NOT SUE," Ms. Cole told Mr. Chin that "she was frustrated that Mr. Compton was getting away with ruining her reputation and trying to destroy her career and that there was nothing she could do to stop it." *Id.* ¶ 72. Ms. Cole also alleges

_____

[8] The Court notes that in the original Complaint, Ms. Cole alleged that she "informed the investigator that she felt she was being harassed *because of her gender*." Compl. [Dkt. 1] ¶ 71 (emphasis added). The phrase "because of her gender" is not contained in paragraph 42 of the Second Amended Complaint, which is otherwise identical to paragraph 71 of the original Complaint. *See* 2nd Am. Compl. ¶ 42. Because this phrase was deleted from the Second Amended Complaint and there is no evidence in the record to support it, the Court has no basis to infer that Ms. Cole complained of harassment based on gender when she went to the OIG, and it declines to do so. *See Anderson*, 477 U.S. at 255 (only "justifiable inferences are to be drawn in" favor of the nonmovant).

In her Opposition, Ms. Cole asserts that she "complained about her *sexually* hostile work environment to the OIG." Pl. Opp'n [Dkt. 48] at 11 (emphasis added). The claim that she complained about a *sexually* hostile work environment is not borne out by the record. *See* 2nd Am. Compl. ¶ 42 ("She also informed the [OIG] investigator that she felt she was being harassed . . . ."); Cole Affidavit (Cole Decl.) [Dkt. 48-2] ¶ 4(i) ("I spoke to the NGA's OIG alleging my harassment and hostile work environment by Mr. Dean Compton . . . ."); OIG 7/16/10 Letter ("The Office of Inspector General (OIG) reviewed your 14 April 10 concern alleging mistreatment and a hostile working environment . . . ."). Moreover, even if Ms. Cole had complained to the OIG about "discrimination," this vague and unspecific statement would not be sufficient to alert anyone to a potential Title VII complaint. Critically, Ms. Cole does not offer any evidence that she complained to Boeing about discrimination made unlawful by Title VII.

that she told Mr. Chin, a co-worker, on three separate occasions that she wanted to file an EEO complaint, but he failed to tell her how to do so. *Id.* ¶¶ 57-58, 76, 79, 82.[9]

In describing her protected activity, not once does Ms. Cole mention unlawful discrimination in violation of Title VII. Notably, the Second Amended Complaint does not specify the nature of Ms. Cole's protected class, except to describe her as a "40 year old Caucasian female." 2nd Am. Compl. ¶ 10. Ms. Cole's own Declaration, which purports to describe all of her alleged protected activity, fails to mention discrimination or identify gender as an issue. *See* Cole Decl. at 2. Throughout the lengthy and detailed Second Amended Complaint, there are occasional references to the opinions of fellow employees that NGA was male-dominated and inhospitable to women, *see* 2nd Am. Compl. ¶¶ 29 (Ms. McGhee's experiences); *id.* ¶¶87, 88 (Stephen Fraise's opinions), but nothing in the operative allegations connects any aspect of Mr. Compton's alleged conduct or, more importantly, Boeing's responses, to either Ms. Cole's gender or to her alleged Title VII activity. References to the observations and perceptions of others are not evidence that Ms. Cole complained of activity made unlawful by Title VII.

Ms. Cole is quite candid that she blames Mr. Compton for slandering her reputation *because* he thought she had destroyed the PLSS database, *because* he thought she had destroyed his hard-won working relationship with PLSS, *because* she was not a geospatial analyst, and/or *because* she complained to the IG about him. *See* 2nd Am. Compl. ¶¶ 34, 36, 42, 53, 55-57, 64, 66, 67, 80, 81. In his deposition testimony, Mr. Hand emphasized that Ms. Cole

---

[9] Ms. Cole identifies the following as evidence of her alleged protected activities: In July 2010, Mr. Chin suggested that she file an EEO charge; Mr. Chin told her that Mr. Hand called him and told him to advise Ms. Cole not to sue; Mr. Hand visited her in August 2010 to "inform her that swapping her out was the best option." *See* Pl. Opp'n at 9-10; Cole Decl. ¶¶ 4(i), 4(iii), 4(iv), 4(vi). Because these incidents describe communications by other individuals and not Ms. Cole, they cannot establish the first prong of a *prima facie* case for retaliation, which requires evidence that the *plaintiff* herself engaged in protected activity. *See Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006).

"never came to me and said that it was a sexual harassment or discrimination case or any other sort of EEO complaint. I was under the assumption that it was a personality conflict and had no other cause to believe otherwise." Pl. Hand Dep. at 100; *see also* Mem. in Opp'n., Ex. D (Def. Hand Dep.) at 81 ("At no point did she mention sex discrimination, in any of her e-mails."). In the absence of evidence in the record that Ms. Cole reasonably believed she was the subject of discrimination made unlawful under Title VII, Ms. Cole's inquiry to her co-worker about filing an EEO complaint does not constitute protected activity. *See Goode v. Billington*, 932 F. Supp. 2d 75, 93 (D.D.C. 2013) (Plaintiff's threat to file a hostile work environment complaint was not protected activity because "[a]t the time the Plaintiff first threatened to file a hostile work environment complaint, the Plaintiff did not, and could not reasonably, believe he was being harassed on the basis of his religion.").

Even if Ms. Cole were found to have engaged in protected activity, Boeing would be entitled to summary judgment because Ms. Cole has failed to establish the second prong of her *prima facie* case. Ms. Cole argues that she suffered the following materially adverse actions: she was told not to sue Mr. Compton for civil damages; she received an average interim performance review; she was transferred from the Washington Navy Yard to a position at the NGA Crystal City, Virginia office; and she lost opportunities for overtime. *See* 2nd Am. Compl. ¶¶ 71, 84, 86; Plaintiff's Statement of Material Facts in Dispute [Dkt. 48-1] ¶¶ 4, 10. The Court agrees with Boeing that none of these actions constituted a materially adverse action.

Ms. Cole seizes upon Mr. Hand's DO NOT SUE email to prove interference with her protected rights. In doing so, she ignores the context of the statement. Ms. Cole asked to be advised when she could sue Mr. Compton *for slander* and Mr. Hand answered, DO NOT SUE

because it would interfere with Boeing's NGA contract.  *See* Hand/Cole Email Chain at 2-3.[10]

This exchange is a far cry from reaction to, or retaliation for, Title VII activity.

        An average performance evaluation, such as the one Ms. Cole received in August

2010, may not rise to the level of a materially adverse action absent evidence that the evaluation

affected an employee's "position, grade level, salary or promotion opportunities" or were

"attached to financial harms."  *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting

*Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (internal quotation marks

omitted)).  Although Ms. Cole was transferred to Virginia after receiving the average

performance evaluation, nothing in the operative allegations connects the performance

evaluation to her transfer.  She has presented no evidence that the evaluation itself affected her

position, grade level, salary or promotion opportunities or was attached to financial harms; in

fact, she was made a team lead after her transfer.

        Similarly, Ms. Cole's transfer to the Virginia office does not rise to the level of a

materially adverse action.  A "lateral transfer—that is, a transfer involving no diminution in pay

and benefits—may qualify as a materially adverse employment action if it result[s] in materially

adverse consequences affecting the terms, conditions, or privileges of the plaintiff's

employment."  *Geleta*, 645 F.3d at 411 (citations and internal quotation marks omitted).  Ms.

Cole attests that the transfer did not result in the loss of pay and did not increase her commute.

Cole Dep. at 209-210, 251.  Ms. Cole became a team lead, which she thought was a good thing.

*Id*. at 251.  Her conclusory assertion that she lost opportunities to earn overtime pay is

unsupported by any evidence in the record and cannot raise a genuine issue of material fact.

_____

[10] Ms. Cole blatantly misrepresents the record in her Opposition by stating that Mr. Cole sent this
email in response to her inquiry about filing a formal charge with the EEOC.  *See* Pl. Opp'n at 3.
This is completely inaccurate.  *See* Hand/Cole Email Chain at 2-3.

*Dist. Intown Properties Ltd. P'ship v. D.C.*, 198 F.3d 874, 878 (D.C. Cir. 1999) (in deciding a motion for summary judgment, "the court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record"); *Greene*, 164 F.3d at 675 (nonmovant must present specific facts that would enable a reasonable jury to find in its favor).

      Ms. Cole's deposition testimony also makes clear that she perceived the transfer to be retaliatory for subjective reasons unrelated to her gender. She says she viewed the transfer as a form of retaliation against her "[b]ecause I was close with my teammates and we got along well, and also the people that I was seeing do the type of work that Dean Compton was placing on this project were not qualified to do it" and "because I had no say in anything. [Mr. Hand] just moved me." Cole Dep. at 247-48. "[P]urely subjective injuries, such as dissatisfaction with a reassignment . . . are not adverse actions . . . ." *Holcomb*, 433 F.3d at 902 (citations and internal quotation marks omitted). *See also Russell*, 257 F.3d at 818 ("[N]ot everything that makes an employee unhappy is an actionable adverse action."). Because Ms. Cole has provided no evidence that the transfer adversely affected the terms, conditions, or privileges of her employment in a material way, the Court is unable to conclude that she suffered a materially adverse action. *See Burlington*, 548 U.S. at 71.

      Finally, were Ms. Cole able to show that she took actions protected by Title VII and that she suffered a materially adverse action, she nonetheless has failed to point to a genuine issue of material fact that her alleged protected activities were the but-for cause of her transfer. *See Nassar*, 133 S. Ct. at 2533 (to prevail on a Title VII retaliation claim, a plaintiff must prove but-for causation). A reasonable jury could not find that Boeing would not have transferred Ms. Cole to Virginia but for protected activity, in light of the problems between Mr. Compton and

Ms. Cole.  *See* Email Chain Re: Swap at 2 (Mr. Hand "[didn't] see the friction between Debbie [Cole] and Dean [Compton] fading anytime in the next decade."); Hand/Cole Email Chain at 2 (Mr. Hand emailed Ms. Cole that "Yes, while you're on this contract, you WILL have this sort of conflict the entire time as long as Dean Compton is your [NGA Point of Contact]."); Ballard 7/29/10 Email at 4 (Mr. Ballard emailed Mr. Hand that "the working relationship with PSID and PL are strained with Ms. Cole's continued presence"); Emails Re: Compton Comments at 5 (Mr. Compton emailed Mr. Ballard that "Ms [sic] Cole performs jobs when instructed but has very limited ability to perform at the expected level for an experienced GA."); Cole Dep. at 145-46 (Mr. Compton told Ms. Cole "he doesn't want me in that group, that they need a geospatial analyst, they don't need a photogrammetrist."); *Id.* at 159 ("I just remember back then being, feeling like why didn't Boeing management do their homework before I came to the site and find out if they wanted the right, the title or not.").  *See Rattigan v. Holder*, 982 F. Supp. 2d 69, 83 (D.D.C. 2013) ("Under *Nassar,* the existence of true allegations implicating legitimate security concerns make it impossible for a jury to find that the [electronic communication detailing concerns about the Plaintiff] would not have been referred [to the FBI Security Division] but-for a retaliatory animus.").

The Court concludes Ms. Cole never complained of discrimination made unlawful under Title VII and that she could not have reasonably believed she was engaged in protected activity under Title VII while in Washington, D.C.; the evidence does not support a claim for retaliation due to a complaint of gender or other discrimination under Title VII.  The Court further concludes that she did not suffer a materially adverse action and that there is no issue of material fact that her alleged protected activities were the but-for cause of her transfer.  Ms. Cole

has thus failed to establish a *prima facie* case of retaliation. Boeing's motion for summary judgment on Count 1 will be granted.

### B. DCHRA Allegations

The DCHRA makes it unlawful to retaliate against a person "because that person has opposed any practice made unlawful by this chapter, or because that person made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under this chapter." D.C. Code § 2-1402.61(b). Count II of the Second Amended Complaint alleges retaliation under the DCHRA. Count II contends that Ms. Cole "engaged in protected activity and opposition to practices made unlawful under the DCHRA by complaining and opposing discriminatory and/or harassing practices at the workplace, and by participating in protected activity with the OIG and/or the EEO or the EEOC." 2nd Am. Compl. at 12.

The analysis of Ms. Cole's claim of retaliation under Title VII applies equally to Ms. Cole's claim under the DCHRA. *See Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. Cir. 1994) (retaliation claims under the DCHRA are analyzed using the same legal framework as federal retaliation claims). The Court will also grant the motion for summary judgment on Count II.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant Boeing's motion for summary judgment and judgment will be entered in favor of Boeing. A memorializing Order accompanies this Opinion.


Date: November 7, 2014                          _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge